UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THOMAS LEIDLEIN, II,

          Plaintiff,

v.                                                                    Case No. 14-10718
                                                                      HON. TERRENCE G. BERG

COMMISSIONER OF SOCIAL
SECURITY,

          Defendant.

_____/

**ORDER DENYING PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT (DKT. 14) AND GRANTING
<u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. 16)</u>**

This is an action for judicial review of an adverse decision of the

Commissioner of Social Security brought pursuant to 42 U.S.C. § 405(g).  Plaintiff

Thomas Leidlein, II, ("Plaintiff") seeks a reversal of the Commissioner's decision

that he is not disabled and therefore not eligible for a period of disability and

disability benefits under Title II of the Social Security Act.  Plaintiff contends that

the Administrative Law Judge ("ALJ"): (i) erred by finding that his degenerative

disc disease in his cervical spine (neck) was not a severe impairment at step two; (ii)

failed to weigh an opinion from a consultative examiner, Dr. George Pestrue; and

(iii) that the Residual Fuctional Capacity ("RFC") finding fails to adequately

account for his moderate limitations in concentration, persistence, or pace ("CPP").

This matter is before the Court on cross-motions for summary judgment. As

discussed below, substantial evidence supports the ALJ's decision.  Therefore,

Plaintiff's motion for summary judgment (Dkt. 14) is **DENIED** and Defendant's

motion for summary judgment (Dkt. 16) is **GRANTED**, and the findings and conclusions of the Commissioner are **AFFIRMED**.

## I.    BACKGROUND

### A. Relevant Medical Evidence

Plaintiff's motion for summary judgment did not summarize the medical evidence in the record.  Defendant's motion was substantially accurate in summarizing the relevant medical evidence, as recounted below, with some revisions by the Court.

Plaintiff underwent a cervical spine MRI on October 10, 2011, which noted the following: right paracentral disc osteophyte complex minimally effacing anterior CSF space at C6-C7; broad-based disc osteophyte complex effacing anterior CSF space; bilateral neural foramina narrowing greater on the right than the left at C5-C6; and right paracentral disc osteophyte complex effacing anterior CSF space at C4-C5 (Tr. 362).  Additionally, a September 2011 Electrodiagnostic Study concluded that there was evidence of C7 radiculopathy (Tr. 365).  Plaintiff was still working at the time of these tests; his alleged disability onset date is April 12, 2012.

On April 18, 2012, Plaintiff reported feeling down and depressed after losing his job (Tr. 318).  Plaintiff explained that he lost his job after he was caught drinking alcohol at work (Tr. 16, 263).  Plaintiff claimed that he subsequently experienced a great deal of financial stress, and had been feeling depressed, hopeless, and helpless about his situation (Tr. 263).

On September 7, 2012, Plaintiff presented to the emergency room, complaining of fatigue, shortness of breath, and chest pain (Tr. 261). A chest x-ray revealed no active pulmonary disease (Tr. 360). He was admitted with diagnoses of electrolyte imbalance and liver failure (Tr. 263), and he was treated with detoxification protocols and IV fluids (Tr. 261). During Plaintiff's September 2012 admission, he consulted with a psychiatrist about his ongoing alcohol abuse and depression (Tr. 263). On exam, Plaintiff had a depressed mood, constricted affect and displayed psychomotor slowing (Tr. 264). He also demonstrated limited insight and judgment (Tr. 264). Plaintiff was diagnosed with a major depressive disorder, recurrent, moderate; an anxiety disorder (not otherwise specified); and alcohol dependence (Tr. 264). He was also assigned a Global Assessment of Functioning ("GAF") score of 55 (Tr. 264). Plaintiff was prescribed Zoloft for depression and Trazodone for insomnia (Tr. 265). The hospital requested that Plaintiff be admitted to inpatient treatment for alcohol abuse, but Plaintiff declined and was discharged on September 10, 2012 (Tr. 261).

On September 20, 2012, as part of a clinical assessment summary for Bay Arenac Behavioral Health ("Bay Arenac"), Plaintiff explained that he was limited in the activities he could do because of his lack of financial resources (Tr. 282). However, he explained that he was considering hunting in the fall (Tr. 282). With respect to physical pain, Plaintiff only reported daily headaches (Tr. 281). At the outset of his treatment at Bay Arenac, Plaintiff was diagnosed with a major depressive disorder and alcohol dependence (Tr. 282). He was also assigned a

3

GAF of 45 (Tr. 283).

On November 1, 2012, Plaintiff was admitted to the hospital with abdominal pain and was admitted for two days with mild pancreatitis (Tr. 247). He also suffered from cirrhosis of the liver due to heavy alcohol abuse and dependency (Tr. 247). After this brief hospital stay, where he was detoxed and treated with IV fluids, Plaintiff was discharged in stable condition (Tr. 247).

On November 19, 2012, Plaintiff met with Dr. Gary Ralph for a complete mental health evaluation (Tr. 295). Plaintiff's main complaint at this time was alcoholism (Tr. 295). He explained that his alcoholism had cost him two marriages and a well-paying job (Tr. 295). Plaintiff explained that he often felt depressed and that he struggled with anxiety in the form of panic attacks (Tr. 295). Plaintiff also described agoraphobic symptoms that made it hard for him to shop in public (Tr. 295). On exam, Plaintiff appeared glum, anxious and disheveled (Tr. 296). However, his associations were intact, thinking was logical, thought content was appropriate, and judgment and insight were fair (Tr. 296). Dr. Ralph diagnosed alcohol dependence, major depressive disorder, and an anxiety disorder (Tr. 296). He assigned a GAF score of 45 (Tr. 296). Dr. Ralph recommended that Plaintiff participate in a residential substance abuse treatment program (Tr. 296). Plaintiff declined, noting that he was not ready to give up alcohol (Tr. 296). Due to the potential side effects, Plaintiff was instructed to stop taking Xanax and Trazodone in light of his refusal to stop drinking alcohol (Tr. 296). Instead, Dr. Ralph instructed Plaintiff to continue taking Zoloft and to start taking Zyprexa (Tr. 297).

By December 5, 2012, Plaintiff's condition had not improved (Tr. 298). Plaintiff did not follow Dr. Ralph's medical recommendations.  In particular, Plaintiff continued to take Xanax and had not started taking Zyprexa (Tr. 298).  Dr. Ralph again tried to convince Plaintiff to enter a psychiatric hospital or residential substance abuse treatment, but Plaintiff continued to refuse (Tr. 298).  Dr. Ralph could not force Plaintiff to enter either facility as Plaintiff did not meet the criteria for involuntary hospitalization (Tr. 298).

On January 9, 2013, Plaintiff explained that he was feeling better, but noted that he was charged with a DUI over Christmas (Tr. 300).  He also reported increase stomach pain, which his primary care physician told him was a flare-up of his pancreatitis (Tr. 300).  Though he had cut back his alcohol intake, he still continued to drink regularly and his overall mental health had not improved (Tr. 300-01).

By June 2013, Plaintiff was finally ready to stop drinking alcohol and sought out detoxification at the Dot Caring Center (Tr. 416).  On June 3, 2013, he was admitted to Dot Caring Center's alcohol detoxification program (Tr. 408).  At the start of this program his GAF score was 45 (Tr. 409).  However, Plaintiff was discharged to a residential program after four days (Tr. 408-09).  He continued treating and completed all of his goals by June 25, 2013 (Tr. 409).  At that time, Plaintiff was discharged from treatment and assigned a GAF of 75 (Tr. 409).

On June 17, 2013, Michigan's Disability Determination Services sent Plaintiff for a mental consultative exam administered by Dr. George Pestrue (Tr.

401-06).  With regard to his alcohol abuse, Plaintiff stated that he was not an alcoholic (Tr. 402).  He explained that he used to drink every day, then he cut back, and then he stopped on June 3, 2013 (Tr. 402).  Plaintiff explained that in a typical day he gets up, watches television all day, and then goes to bed (Tr. 403).   On exam, Plaintiff was friendly, cooperative, verbal, and spontaneous (Tr. 403).  He had appropriate speech with clear articulation (Tr. 403).  Plaintiff demonstrated adequate contact with reality, fair insight, a logical thought process, and normal thought content and memory (Tr. 403-04). However, he also displayed low self-esteem, a depressed and anxious mood, and a flat affect (Tr. 403-04). Dr. Pestrue then made the following "Medical Source Statement"

> [Plaintiff's] depression leaves him tired and lacking in motivation. He appears to have a history of panic attacks that appear to be stress triggered. He has concentration and attention problems. He has a history of abusing alcohol. He also claimed to have difficulties with reading, spelling, and math (Tr. 406).

Dr. Pestrue also diagnosed Plaintiff with major depression, a generalized anxiety disorder, attention deficit hyperactivity disorder ("ADHD"), alcohol dependence (in remission), and a history of panic attacks (in remission) (Tr. 406).  He also assigned Plaintiff a GAF score of 48 and gave Plaintiff a guarded prognosis (Tr. 406).

On October 10, 2013, Plaintiff reported that he continued to maintain his sobriety (Tr. 423). Plaintiff also reported that his issues with depression and anxiety persisted (Tr. 423).  On exam, Plaintiff was not in any acute distress and did not present with any involuntary movements (Tr. 424).  He was talkative, had appropriate responses, denied any hallucinations, and displayed no paranoia (Tr.

424). His mood was irritable, depressed and anxious; but he had fair memory, attention, concentration, judgment and insight (Tr. 424). He was diagnosed with major depression, an anxiety disorder, and alcohol dependence, and assigned a GAF of 45 to 50 (Tr. 424).

## B.  Plaintiff's Testimony

Plaintiff testified that he lives in a three-bedroom home with his girlfriend and her twenty-year-old son (Tr. 15).  Plaintiff explained that he is unable to work due to anxiety and depression (Tr. 16).  He explained that since losing his job, he no longer has any ambition and he no longer has the ability to deal with people (Tr. 16).  He clarified that being around the public causes him stress (Tr. 16), and that he is better around small groups of familiar people (Tr. 22).

Plaintiff also testified to physical pain in his knees (Tr. 23).  He testified that he can only stand for about 30 minutes before needing to sit for 30-45 minutes due to knee pain (Tr. 23).  He testified that his doctor prescribes him Vicodin, which dulls this pain (Tr. 23).

Plaintiff also testified to stiffness in his neck (Tr. 24).  He described this as a constant problem, but explained that although his neck was sore it did not prevent him from twisting it (Tr. 24).  He stated that his neck pain was worse on rainy days (Tr. 24).  He said that his pain medication also helps with his neck pain (Tr. 24). Plaintiff also stated that his neck pain had gotten worse since an MRI in 2011 (Tr. 24).

## C.  Vocational Expert Testimony

The ALJ asked the vocational expert ("VE") to identify Plaintiff's past work (Tr. 33). The VE described Plaintiff's past work as that of a line servicer, heavy, skilled (SVP 7) (Tr. 45). Next, the ALJ asked the VE a hypothetical question regarding what work could be performed by a person with Plaintiff's age, education, vocational profile, and had "no exertional limitations …, can perform simple tasks on a sustained basis. And will best work alone or in a small group of familiar individuals with no more than superficial contact with the public" (Tr. 33). The VE testified that such a person could not perform Plaintiff's past work (Tr. 33). The VE then testified that such a person could perform the jobs of assembler/production worker and janitor/building cleaner (Tr. 34-35).

## D.  The ALJ's Decision

The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial gainful activity since April 12, 2012, his alleged disability onset date (Tr. 44).  At step two, the ALJ found that Plaintiff's anxiety, affective disorders, learning disorder, pancreatitis and alcohol addiction were "severe" within the meaning of the second sequential step. *Id*.  At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations (Tr. 45).  Between steps three and four, the ALJ found that Plaintiff had the residual functional capacity (RFC) to:

> [P]erform a full range of work at all exertional levels but with the following nonexertional limitations: he can perform simple tasks on a sustained basis

8

and will best work alone or in a small group of familiar individuals with no more than superficial contact with the public (Tr. 46).

At step four, the ALJ found that plaintiff could not perform his previous work as a line servicer (Dkt. 52). At step five, the ALJ denied Plaintiff benefits because Plaintiff could perform a significant number of jobs available in the national economy. *Id.*

## II.   DISCUSSION

### A. Standard of Review

In enacting the social security system, Congress created a two-tiered system in which the administrative agency handles claims, and the judiciary merely reviews the agency determination for exceeding statutory authority or for being arbitrary and capricious. *See Sullivan v. Zebley*, 493 U.S. 521 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *See Bowen v. Yuckert*, 482 U.S. 137 (1987). If relief is not found during this administrative review process, the claimant may file an action in federal district court. *See Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal

standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. *See* 42 U.S.C. § 405(g). Therefore, this Court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006); *Mullen*, 800 F.2d at 545 (6th Cir. 1986) (*en banc*). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted).

The scope of this Court's review is limited to an examination of the record only. *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is

no requirement, however, that either the ALJ or the reviewing court must discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x. 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal citation marks omitted); *see also Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed. App'x. 521, 526 (6th Cir. 2006).

## B. Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed. App'x. 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits Program ("DIB") of Title II (42 U.S.C. §§ 401 *et seq.*) and the Supplemental Security Income Program ("SSI") of Title XVI (42 U.S.C. §§ 1381 *et seq.*). Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. *See* F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); *see also* 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined

through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments, that "significantly limits ... physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920.  "If the Commissioner makes a dispositive finding at

any point in the five-step process, the review terminates."  *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence

and severity of limitations caused by her impairments and the fact that she is

precluded from performing her past relevant work."  *Jones*, 336 F.3d at 474, cited

with approval in *Cruse*, 502 F.3d at 540.  If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *See Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241; 20 C.F.R. §§ 416.920(a)(4)(v) and (g).

If the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if the court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *See Mullen*, 800 F.2d at 545.  In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

## C. Analysis

### a. The ALJ Did Not Err In Finding That Plaintiff's Neck Disorder Was Not A "Severe Impairment" At Step Two

Plaintiff's first argument is that the ALJ erred by not finding that his neck condition was a "severe impairment" at step two of the analysis.  The Court notes, at the outset, that Plaintiff fails to point to any medical evidence in the record indicating that his neck condition caused him any restrictions in his ability to work. The record does reveal that Plaintiff has a history of degenerative disc disease in his neck.  Indeed, an MRI from 2011 — taken before his alleged onset date, when he was still working a heavy exertion job — revealed degenerative disc disease (Tr. 362).  Also, contemporaneous electrodiagnostic testing suggested C7 radiculopathy

(Tr. 365). However, when Plaintiff applied for disability in March 2013, he did not allege that this pre-existing neck impairment contributed to his inability to work (Tr. 167). Plaintiff also did not allege any contributing neck issues when he updated his impairments in July 2013 (Tr. 203). However, as Plaintiff notes (Dkt. 14 at 7), he did allege significant pain and functional limitation due to degenerative disc disease in his neck, during his testimony at the administrative hearing (Tr. 24-25).

At step two, the ALJ considered whether Plaintiff's neck impairment was a severe impairment (Tr. 44). She found that it was not (Tr. 44-45). Although Plaintiff argues (Dkt. 14 at 6-7) that the ALJ failed to explain this finding, this is not the case. The ALJ explained (Tr. 44) that she did not find this impairment severe because: (1) Plaintiff never alleged this impairment before the administrative hearing (*Id.* citing, Tr. 167); (2) Plaintiff did not complain about this impairment to his primary care provider (citing generally, Tr. 302-85); and (3) the objective medical findings do not support a significant degree of functional limitation due to this impairment. Since Plaintiff fails to point the Court to any medical evidence indicating that the ALJ somehow erred in arriving at Plaintiff's RFC, Plaintiff's argument is not well-taken.

Moreover, this argument — that the ALJ erred by not recognizing Plaintiff's neck condition as a severe impairment at step two — would not in and of itself warrant a remand. In *Maziarz v. Sec'y of Health and Human Serv's*, 837 F.2d 240, 244 (6th Cir. 1987), the ALJ determined that the plaintiff suffered from several

14

severe cardiac impairments. The plaintiff argued the ALJ erred by not finding a cervical condition to be a severe impairment at step two of the sequential evaluation process. *Maziarz* found it "unnecessary to decide" whether the ALJ erred in failing to find that the plaintiff's cervical condition constituted a severe impairment at step two, because the ALJ continued with the remaining steps of the sequential evaluation process and considered the plaintiff's cervical condition in determining whether he retained a sufficient RFC to allow him to perform substantial gainful activity. Therefore, the Sixth Circuit concluded that any alleged error at step two was harmless. Stated differently, the Sixth Circuit held that, as long as the ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, the ALJ's failure to specifically find additional severe impairments at step two "[does] not constitute reversible error." *Maziarz*, 837 F.2d at 244; *see also, Swartz v. Barnhart*, 188 Fed. App'x. 361, 368 (6th Cir. 2006).

In this case, the ALJ found at step two that Plaintiff suffered from the severe impairments of "anxiety, affective disorders, learning disorder, pancreatitis, [and] alcohol addiction" (Tr. 44) and then proceeded to the next steps in the five-step analysis. The ALJ ultimately concluded that Plaintiff had the RFC for a full range of exertional work. Substantial evidence supports this conclusion, as there is no specific medical evidence relating to Plaintiff's neck condition that physically limited him to less strenuous work. Thus, the ALJ did not err in failing to recognize Plaintiff's neck condition as a severe impairment at step two of the five step process.

### b. *Dr. Pestrue Did Not Provide A "Medical Opinion" For The ALJ To Weigh*

Plaintiff's next argument is that the ALJ failed to weigh an opinion from a consultative examiner, Dr. George Pestrue. Dr. Pestrue conducted a consultative mental exam on June 17, 2013 (Tr. 401-06). After examining Plaintiff, Dr. Pestrue offered the following "Medical Source Statement" –

> [Plaintiff's] depression leaves him tired and lacking in motivation. He appears to have a history of panic attacks that appear to be stress triggered. He has concentration and attention problems. He has a history of abusing alcohol. He also claimed to have difficulties with reading, spelling, and math (Tr. 406).

The governing regulation defines "medical opinions" as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." *See* 20 C.F.R. § 404.1527(a)(2). Notably lacking from Dr. Pestrue's statement are any specific limitations that impair Plaintiff's ability to work.

Dr. Pestrue's statement provides little insight into Plaintiff's actual restrictions. As such, it is not a "medical opinion" as defined by 20 C.F.R. § 404.1527(a)(2). *See Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 n.3 (6th Cir. 2009) (reasoning that a statement that fails to address "the specific extent of [Plaintiff's] limitation" is "outside the scope of 'medical opinions' as defined in 20 C.F.R. § 404.1527(a)(2)").

Furthermore, as the Commissioner correctly points out, the applicable regulations provide only that the opinion of a *treating source* must be weighed, and that such an opinion may be entitled to controlling weight when it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the record. *See* 20 C.F.R. § 416.927(c)(2). The regulations further provide that the ALJ must give "good reasons" for the weight given to a treating source's opinion. *Id*. In this case, however, the ALJ did not fail to weigh or give controlling weight to a treating physician's opinion; Plaintiff argues that the ALJ did not explicitly weigh a consultative examiner's opinion (Tr. 49). As such, the ALJ did not err in failing to explicitly set forth the weight he gave to Dr. Pestrue's opinion. *See Daniels v. Comm'r of Soc. Sec.*, 152 Fed. App'x 485, 490 (6th Cir. 2005) ("The ALJ's failure to specifically address Dr. Pinson's opinion ... is not surprising given that Dr. Pinson does not meet the criteria under the regulations to be defined as a treating physician.").

In sum, the ALJ did not err in failing to explicitly state the weight given to Dr. Pestrue's consulting opinion.

### c.   *The ALJ Adequately Accounted For Plaintiff's Moderate Limitations In Concentration, Persistence and Pace*

Finally, Plaintiff argues that that the RFC finding fails to adequately account for his moderate limitations in concentration, persistence, or pace. Plaintiff relies on *Edwards v. Barnhart*, 383 F. Supp.2d 920 (E.D. Mich. 2005) in support of his argument. The court in *Edwards* held that the ALJ's hypothetical, limiting the

17

plaintiff to "unskilled sedentary work," was not adequate to accommodate plaintiff's moderate limitations of concentration, persistence, and pace because plaintiff may have been unable "to meet quotas, stay alert, or work at a consistent pace, even at a simple, unskilled, routine job." *Id.* at 930. However, as the Commissioner properly argues, other courts in this district have disagreed with *Edwards. See e.g.*, *McNamara*, 2011 WL 7025855, at *12 (collecting cases); *see also Schalk v. Comm'r of Soc. Sec.*, 2011 WL 4406824, at *11 n.6, 7 (E.D. Mich. Aug. 30, 2011) (distinguishing *Edwards* and discussing how "there is no brightline rule requiring remand whenever an ALJ's hypothetical includes a limitation of 'unskilled work' but excludes a moderate limitation in concentration. Rather, [the court] must look at the record as a whole and determine if substantial evidence supports the ALJ's RFC"), *adopted by* 2011 WL 4406332 (E.D. Mich. Sept. 22, 2011); *Lewicki v. Comm'r of Soc. Sec.*, 2010 WL 3905375, at *3 (E.D. Mich. Sept. 30, 2010) (distinguishing *Edwards* and holding that "[d]ecisions in this district reflect the conclusion that a moderate impairment in concentration, persistence, and pace does not necessarily preclude simple, routine, unskilled work"). Thus, "there is no bright-line rule requiring remand whenever an ALJ's hypothetical includes a limitation of 'unskilled work' but excludes a moderate limitation in concentration. Rather, this Court must look at the record as a whole and determine if substantial evidence supports the ALJ's decision." *Taylor v. Comm'r of Soc. Sec.*, 2011 WL 2682682 at * 7 (E.D. Mich. May 17, 2011), *adopted by* 2011 WL 2682892 (E.D. Mich. July 11, 2011).

"[N]umerous courts have found similar hypotheticals adequately account for moderate limitations in [concentration, persistence and pace]." *Johnson v. Comm'r of Soc. Sec.*, 2013 WL 1187031, at *5 (E.D. Mich. Mar. 21, 2013) (citing *Hess v. Comm'r of Soc. Sec.*, 2008 WL 2478325, at *7-8 (E.D. Mich. June 16, 2008) ("Simple routine tasks in a low stress environment" not incompatible with moderate limitations of concentration, persistence, or pace); *Latarte v. Comm'r of Soc. Sec.*, 2009 WL 1044836, at *3 (E.D. Mich. Apr. 20, 2009) ("Unskilled work, by definition, is limited to understanding, remembering and carrying out only simple instructions and requiring little, if any, judgment")).  In *Hess* and *Taylor*, the courts both concluded that because the ALJ relied on the opinions in the Psychiatric Review Technique Form ("PRTF") to reach the conclusion that the plaintiff had moderate limitations in concentration, persistence, and pace, it was reasonable for the ALJ to also rely on the ultimate conclusion in the PRTF that the plaintiff could perform unskilled work on a sustained basis.  *See Taylor*, 2011 WL 2682682 at *7-8 (citing *Hess*, 2008 WL 2478325, at *8 ("Plaintiff's argument for the selective adoption of Dr. Marshall's 'moderate' limitations without considering the ultimate conclusion would amount to a distortion of the record"); *see also Ellis v. Comm'r of Soc. Sec.*, 2013 WL 1289270, at *8 (E.D. Mich. Feb. 13, 2013) (same), *adopted by* 2013 WL 1283484 (E.D. Mich. Mar. 28, 2013).

In this case, assessing the severity of Plaintiff's mental impairments at steps two and three, the ALJ found that Plaintiff had "moderate" difficulties with regard

social functioning and concentration, persistence and pace ("CPP") (Tr. 45-46).  The ALJ later translated those findings into the following work-related functional limitations: "he can perform simple tasks on a sustained basis and will best work alone or in a small group of familiar individuals with no more than superficial contact with the public" (Tr. 46).  The ALJ's limitation of simple tasks on a sustained basis adequately reflects Dr. Douglass's opinion as to Plaintiff's moderate mental limitations, which is the opinion that the ALJ gave the most weight (Tr. 51, 65-67).  In addition to finding Plaintiff moderately limited with regard to CPP (Tr. 64), Dr. Douglass also found that Plaintiff was able to perform routine, 2-step tasks on a sustained basis (Tr. 67).  This description of Plaintiff's abilities is not materially different from the RFC found by the ALJ, which also limited Plaintiff to simple tasks on a sustained basis (Tr. 46).  As in *Hess* and *Lewicki*, *supra*, the ALJ's finding of a moderate limitation in CPP must be considered in conjunction with Dr. Douglass's broader conclusions, which suggest that Plaintiff could successfully perform simple tasks on a sustained basis.

In sum, substantial evidence supports the ALJ's findings, and this claim of error is not well-taken.

### III.   CONCLUSION

For the reasons set forth above, Plaintiff's motion for summary judgment (Dkt. 14) is **DENIED**.  Defendant's motions for summary judgment (Dkt. 16) is **GRANTED**, and the findings and conclusions of the Commissioner are **AFFIRMED**.

**SO ORDERED.**


s/Terrence G. Berg
TERRENCE G. BERG
UNITED STATES DISTRICT JUDGE

Dated:  March 27, 2015

### Certificate of Service

I hereby certify that this Order was electronically submitted on March 27, 2015, using the CM/ECF system, which will send notification to each party.


By:  s/A. Chubb
Case Manager